# EXHIBIT W



## CLIENT TRIAL & SOURCED TALENT AGREEMENT

This Client Trial & Sourced Talent Agreement ("Agreement") is made and entered into as of June 14, 2016 ("Effective Date") by and between smartboss inc having its principal place of business at 315 w 21st street #5C NY NY 10011 ("Client"), and **Toptal, LLC** ("Toptal").

**The parties agree as follows:**

1. <u>Work; Acceptance.</u>

1.1. Toptal will use commercially reasonable efforts to make one or more of the independent contractor talent (singular and plural, "Talent") available to perform the work described in one or more Exhibit A's (Talent Outline Plan or "TOP") to this Agreement as set forth in each applicable TOP. Client and Toptal intend to execute one or more TOP(s), all of which will are hereby incorporated into this Agreement by this reference. The first TOP will be attached to this Agreement and signed by Client and Toptal. Subsequent TOPs and changes to existing TOPs may take the form of either (1) an additional or replacement written TOP, with each such written TOP deemed an additional TOP unless the newer TOP expressly states that it is a replacement, or (2) an electronic update to Client's online Toptal account (located on the access-restricted, Client-portion of www.toptal.com) that Client is permitted to access with Client's Toptal account name and password. Toptal will not add to or change Client's TOPs without Client's written consent. In the event that a new or changed TOP is memorialized in Client's online Toptal account, Toptal will provide Client with written notice of any such change and Client will have three (3) business days' notice to correct any errors in such changes. Client will be deemed to accept any such changes if Client allows the beginning or continuation of any Work that is subject to a new rate or if Client does not provide Toptal with a correction for such change within such notice period. Each TOP will describe the services ("Work") to be provided by a Talent, as well as the TOP Start Date, the fees for the Work, the applicable Trial Period, if any, and other relevant information. Client understands that performance of Work depends in part on Client's actions. Accordingly, Client will use commercially reasonable efforts to provide Toptal and its Talent with reasonable information, cooperation, and assistance in connection with the Work. Each Talent will report directly to an employee or contractor of and designated by Client ("Client Contact") and will provide the Work in accordance with Client Contact's reasonable and lawful instructions. Each Client Contact will be responsible for setting, reviewing, and monitoring schedules, Work Output, and the other aspects of each project under a TOP and for coordinating the same with the relevant Talent. "Work Output" means the intangible (including electronic) and tangible results of Work specified in a TOP, as well as any other intangible (including electronic) and tangible Work results created by a Talent and provided to Client under this Agreement. Except as expressly set forth in Section 6, Client acknowledges and agrees that Toptal does not warrant or guarantee the quality of the Work nor the Work Output created by any Talent, or that a Talent will meet any deadlines set by Client. Client will be solely responsible for determining whether any particular Talent meets Client's needs and will be the sole judge of the performance and capability of each Talent engaged in providing Work. Client may, at any time, request the replacement of any Talent who does not meet Client's performance and capability requirements.

1.2. <u>Trial Period.</u> An initial time period of Work described in Exhibit A for the Work performed by any Talent will be treated as a trial period (the "Trial Period"). If the length of the Trial Period is not stated in the applicable TOP, the Trial Period will be five (5) business days. If Client is not completely satisfied with a particular Talent at the end of the Trial Period, Client will describe in writing the reasons for its dissatisfaction to Toptal within 24 hours after the end of the Trial Period. In such event, Toptal will not invoice Client for such Talent's Work during such Trial Period and will provide Client with another Talent for an additional Trial Period. If Client is not satisfied with such alternate Talent, Toptal will apply the same Trial Period process described for a total of up to five (5) Talent, at which time Toptal or Client may terminate this Agreement or applicable TOP by written notice to the other, and such termination will be Client's sole and exclusive remedy. If Client does not provide Toptal with such Notice in the above time period, the relevant Talent will be deemed acceptable and Toptal's normal invoicing will commence including billing for Work performed during the Trial Period. In the event that Client requests a Talent be replaced, or if such Talent becomes unavailable during or after a Trial Period, Toptal will, as its sole obligation and Client's exclusive remedy for the same, use commercially reasonable efforts to promptly replace such Talent. Such replacement Talent will be provided subject to the trial program described in this Section 1.2. ("Trial Program"). Notwithstanding anything in this Agreement to the contrary, the Trial Program will only apply to each Talent's initial engagement with Client under a TOP.

1.3. <u>Time Off.</u> Client will not pay Talent or Toptal for any vacation time or other days off which the Talent and Client agree Talent can take outside the scope of this agreement

(collectively "Time Off"). Client, Talent and Toptal must confirm Time Off Time via email or Toptal's portal for confirmation, documentation, and appropriate fee adjustments.

2. Fees; Billing Procedures.

2.1. Client will pay Toptal the fees for Work provided by each Talent as stated on the applicable TOP. Toptal will invoice Client biweekly for Work provided to Client during the preceding two-week period.

2.2. Client agrees to pay Toptal all pre-approved, actual and reasonable travel, lodging and other out of pocket expenses incurred by Toptal in conjunction with the Work. All payments are due upon receipt of invoice.

2.3. All payments will be paid electronically via credit card, bank wire, ACH transfer, or PayPal. Failure to receive any payment within ten days after the time such payments is due will result in an interest charge of one and a half percent (1.5%) per month on the outstanding amount. Further, in the event of any action by Toptal to collect any amount not paid when due, including any amounts under Sections 2 or 4, Client will pay or reimburse Toptal's costs of collection (including, without limitation, any attorneys' fees and arbitration costs).

3. Non-Solicit. Subject to Section 4, during the term of this Agreement and for twelve (12) months thereafter, Client will not, directly or indirectly, encourage or solicit to hire, or otherwise hire or engage for performance of services (excluding the Work hereunder) any Talent of Toptal who Client becomes aware of in connection with this Agreement. Client also agrees that it will not refer such Talent directly to subsidiaries, parent companies, partnerships, holdings or investors related to Client without processing such request through Toptal's Client intake processes. Client also agrees that it will not induce any such Talent to recruit or refer talent of any kind to Client or third parties nor will Client cooperate with any efforts of such Talent to do the same.

4. Option to Hire Talent.

4.1. Nothing in this Section 4 is intended to constrain the employment of any Talent. Subject to Client's prior written notice to Toptal, the right to a reasonable wind-down period described below, and full payment of the buyout fee described in Section 4.2, Client may, at any time during or after the term of this Agreement, opt to directly engage or employ any Talent. Such wind-down period is typically thirty (30) days, but may be reasonably adjusted by Toptal based on the Talent's then-existing commitments to Toptal related to Toptal's business, including but not limited to commitments to other Clients.

4.2. With respect to each Client-Hired Talent (defined below), Client will, within thirty (30) days of hiring or engaging such Talent, pay Toptal a buyout fee of thirty thousand ($30,000.00) dollars. Toptal's expenses incurred replacing a Client-Hired Talent hired hereunder cannot be ascertained with certainty, so the parties agree that the buyout fee is a reasonable estimate of Toptal's expenses to find, recruit, screen, train and replace each Client-Hired Talent, and otherwise operate its business with respect to such replacement Talent. "Client-Hired Talent" means a Talent who meets both of the following two criteria: (1) the Talent is introduced to Client by Toptal and/or the Talent provides or agrees under a TOP to provide Work to Client under or in connection with this Agreement, and (2) the Talent is hired as an employee of or otherwise engaged by Client (a) during the term of such Talent's work for Client under or in connection with this Agreement or (b) during the twelve (12) month period immediately following such Work.

5. Term/Termination. This Agreement will commence on the Effective Date and continue in effect until terminated under this Section 5. If either party materially breaches this Agreement, the other party may immediately terminate this Agreement in its entirety or the affected TOP(s) by giving the breaching party written notice. Each party also may terminate this Agreement in its entirety or a particular TOP hereunder at any time, with or without cause, upon three (3) business days' written notice to the other party. Sections 2, 3, 4, 5, 6.2, 6.3, 7, 8 and 9 will survive any termination or expiration of this Agreement. Upon termination of this Agreement or a TOP, Client agrees to pay Toptal all amounts due or accrued under the Agreement or TOP as of the date of such termination in accordance with the applicable TOP and this Agreement.

6. Warranty and Disclaimer.

6.1. Warranties. Toptal represents, warrants and agrees that: (a) each Talent will perform the Work hereunder in a professional manner; (b) Toptal has full power, right and authority to enter into this Agreement, to carry out its obligations under this Agreement and to grant the rights granted to Client herein; and (c) Toptal has not granted any rights to any third party which conflict with the rights Toptal grants herein.

6.2. Product and Technology Management Responsibility. As between Client and Toptal and its Talent, Client is solely, exclusively, and entirely responsible for managing the development of its own technology, website(s), products, and associated materials including with regard to Talent's Work and Work Output. Client agrees that it will make Talent aware of the same processes and policies it uses and enforces with its own research, engineering and development employees and other contracted resources. Client is responsible for acquiring all rights and licenses to any software, code, information, documentation, or other materials and intellectual property that it acquires from third parties (excluding Talent) and furnishes to Talent in connection with each TOP and for ensuring that Client has all rights and licenses necessary to enable the Talent to use the same (solely for the Work). CLIENT ASSUMES ALL RISKS WITH RESPECT TO CLIENT'S TECHNOLOGY, WEBSITES, PRODUCTS AND RELATED MATERIALS, INCLUDING ALL WORK AND MATERIALS INCOPORATED THEREIN.

6.3. EXCEPT AS EXPRESSLY PROVIDED IN THIS SECTION 6, TOPTAL MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, WITH RESPECT TO THE WORK, WORK OUTPUT OR OTHER

RESULTS ARISING FROM OR RELATING TO THIS AGREEMENT, AND TOPTAL HEREBY DISCLAIMS ALL OTHER REPRESENTATIONS AND WARRANTIES, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT, AND ANY REPRESENTATIONS OR WARRANTIES ARISING FROM COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE.

7. Ownership Rights/License. The assignments and license rights provided to Client in this Section 7 are expressly conditioned on Client paying all fees due and owing to Toptal. Subject to the foregoing, Toptal hereby assigns to Client all rights, title and interest owned by and vested in Toptal, in and to all Work Output provided to Client by each Talent in performance of the Work hereunder and all intellectual property rights Toptal has (including without limitation, patents, copyrights, trade secrets, moral rights and all other intellectual property or proprietary rights) therein, provided, however, that such assignment does not include any Underlying Technology. "Underlying Technology" will mean (a) Toptal technology, methodologies, know-how and intellectual property existing as of the Effective Date or otherwise arising outside of work under this Agreement, (b) any derivatives, improvements, enhancements or extensions of the foregoing that are conceived, reduced to practice, or developed in performance of this Agreement that have general applicability in Toptal's business, and (c) any intellectual property relating to any of the foregoing. To the extent any Underlying Technology is incorporated into or otherwise reasonably necessary to use any such Work Output, subject to the terms and conditions of this Agreement, Toptal grants to Client a non-exclusive, royalty-free, perpetual, irrevocable, sublicensable, worldwide license to fully exercise and exploit the Underlying Technology and to make derivative works of the same in connection with the exploitation of the Work Output provided hereunder. Subject to the first sentence of this Section 7, Toptal will (and will cause each Talent to) reasonably assist Client, at Client's request and expense, to further evidence, record, perfect, and maintain any rights assigned.

8. Confidentiality.

8.1. All business, technical or financial information disclosed by one party ("Discloser") to the other party ("Recipient") hereunder will be the "Proprietary Information" of the Discloser. All Work Output provided under this Agreement that has been fully paid for by Client (or that are not subject to payment default by Client) will be deemed the Proprietary Information of Client. For clarity, the Proprietary Information of Toptal includes, without limitation, the names, contact information, Toptal's screening and selection criteria for, rates and particular skills of each Talent in Toptal's network. Each party will (and Toptal will use commercially reasonable efforts to cause each Talent to) hold in confidence and not disclose or, except in performing the Work, use any Proprietary Information of the disclosing party. Proprietary Information will not include any information the Recipient can document (i) is or becomes readily publicly available without restriction through no fault of the receiving party, or (ii) was in its possession or known by it without restriction prior to receipt from the Discloser, or (iii) was rightfully disclosed to it by a third party without restriction, or (iv) was independently developed without use of any Proprietary Information of the Discloser by employees or consultants of the Recipient. The Recipient may make disclosures required by law or court order provided the Recipient provides the Discloser with advance written notice of such disclosure and cooperates with the Discloser, at the Discloser's request and cost, in any attempts by the Discloser to limit or prevent such disclosure.

8.2. Upon termination of this Agreement and as otherwise requested by the Discloser, the Recipient will (and Toptal will use commercially reasonable efforts to cause Talent to) promptly return to the Discloser all items and copies containing or embodying Proprietary Information of the other party (including, without limitation, all Work Output and all work-in-progress, provided Client has paid Toptal all fees due and owing). Client agrees that Toptal and its Talent will have no liability with respect to any Work to the extent that performing such Work is dependent upon access to and/or use of the Client's Proprietary Information that was returned to Client at Client's request.

9. General.

9.1. Publicity. After working with Toptal for more than two weeks following a successful Trial Period with a Toptal Talent, Toptal also may refer to Client (including any Client related companies affiliated through ownership or control) on Toptal's website or other marketing material which displays clients of Toptal and to use Client as a possible reference, provided that Client may decline Toptal this right, by emailing optout@toptal.com stating that it does not wish to be used as a reference or listed on Toptal's website. Thirty (30) days following a successful Trial Period with a Toptal Talent, Toptal and Client may issue a press release or other public statement related to this Agreement if each consents in writing to the same.

9.2. Relationship of Parties. For all purposes under this Agreement, Toptal and each Talent are independent contractors of Client and the parties hereto are not authorized to and will not bind or attempt to bind the other to any contract. Toptal only will be responsible for compensation payable to the Talent and Toptal's income taxes in connection with this Agreement, and Client will be responsible for all other taxes and assessments including without limitation, sales, value-added, use and similar taxes, if any.

9.3. Dispute Resolution; Jury Waiver. THIS AGREEMENT IS MADE UNDER, AND WILL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED SOLELY THEREIN, WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OF LAW. In any action between or among any of the parties, whether arising out of this Agreement or otherwise, (a) each of the parties

irrevocably and unconditionally consents and submits to the exclusive jurisdiction and venue of the state and federal courts located in Wilmington Delaware; (b) EACH OF THE PARTIES IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY TRANSACTIONS CONTEMPLATED HEREBY; and (c) each of the parties irrevocably consents to service of process by first class certified mail, return receipt requested, postage prepared, to the address at which such party is to receive notice in accordance with Section 9.5.

9.4. Limitations of Liability. EXCEPT FOR A BREACH OF SECTION 3, NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, CONSEQUENTIAL, INDIRECT, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES (INCLUDING DAMAGES FOR LOSS OF BUSINESS, LOSS OF PROFITS OR THE LIKE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, SUCH PARTY'S PERFORMANCE HEREUNDER, THE USE OR INABILITY TO USE ANY SERVICES OR WORK OUTPUT, OR ANY INTERRUPTION OR DISRUPTION OF OR BY ANY OF THE FOREGOING, EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND REGARDLESS OF THE CAUSE OF ACTION (WHETHER IN CONTRACT, TORT, BREACH OF WARRANTY OR OTHERWISE). THE AGGREGATE LIABILITY OF TOPTAL WITH REGARD TO THIS AGREEMENT WILL IN NO EVENT EXCEED THE AGGREGATE COMPENSATION PAID BY CLIENT TO TOPTAL UNDER THIS AGREEMENT DURING THE SIX (6) MONTHS IMMEDIATELY PRECEDING THE DATE ON WHICH SUCH CLAIM ARISES.

9.5. Miscellaneous. Neither party will have the right to assign this Agreement to another party without the other party's written consent, except that either party may, upon written notice to the other party (and without the other party's consent), assign this Agreement in its entirety to a parent company, any subsidiary of a parent company, or an assignee in connection with a corporate reorganization, acquisition, merger, or sale of or substantially all of its assets; provided that the assignee agrees in writing to be bound by all of the terms and conditions of this Agreement. This Agreement, together with each Exhibit A and Toptal's Client Platform Access Agreement constitute the entire agreement between the parties. This Agreement will take precedence over and will govern over any inconsistent or conflicting terms in Toptal's Client Platform Access Agreement and/or any TOP/Exhibit A (even if signed), unless and solely to the extent that the parties expressly state in such TOP/Exhibit A that they intend to override a specific term of this Agreement. Any varying terms and conditions in any Client purchase order are hereby rejected and of no force or effect. No waiver, change, or modification to this Agreement will be effective unless in writing signed by both parties. Any notices to Toptal in connection with this agreement will be made by email transmitted to contact@toptal.com provided that Client also send a copy of such notice via U.S. mail or nationally recognized carrier to Toptal, LLC, 548 Market Street, #36879, San Francisco, CA 94104, Attn: Contract Administration. Notices to Client will be made by email or regular mail and will be deemed to have been duly given when sent by Toptal to the email or mailing address associated with Client's account. The section and subsection headings used in this Agreement are for convenience only and will not be used in interpreting this Agreement. Both parties have had the opportunity to review this Agreement and neither party will be deemed the drafter of this Agreement for the purposes of interpreting any ambiguity in this Agreement. The parties agree that this Agreement may be signed by manual or facsimile signatures and in counterparts, each of which will be deemed an original and all of which together will constitute one and the same instrument. In the event that any provision of this Agreement will be determined to be illegal or unenforceable, that provision will be first revised to give the maximum permissible effect to its original intent or, if such revision is not permitted, that specific provision will be eliminated so that this Agreement will otherwise remain in full force and effect and enforceable.

--------------------------

Toptal, LLC

By: _*Mark Bosma*_ (signature)

Name: Mark Bosma

Title: VP of Sales

Client:

By: _(signature)_

Name: brittany rawlings

Title: ceo